—————o—————

5484.

(Court of Appeal, Parish of Orleans.)

## WILLIS J. ROUSSEL vs. RAILWAYS REALTY CO.

1. In the absence of fraud a judgment confirming a tax title is conclusive between the parties thereto that some property belonging to the former owners was validly sold for taxes, and that the property so sold is the same as that described in the judgment.
2. A judgment cannot be attacked for fraud where it is shown that the successful party thereto produced his whole evidence, and the attention of the Judge was particularly directed to those very matters which are afterwards set up as constituting the fraud alleged to have been practiced upon the Court.
3. A judgment of Court decreeing one party to be the owner of the property involved in the suit, has all the force and effect of a conveyance between the parties thereto.
4. One who claims property by prescription (usucaption) must

show affirmatively and clearly the extent, nature and length of his possession.

5. Where the possession is only a civil one resulting from the remains of old constructions, and these are removed and replaced by new constructions erected by a third person, between whom and the former possessor, there is no privity of title or possession, such removal constitutes an interruption of any prescription which might have been running in favor of the former possessor.

Appeal from the Civil District Court, Division "D."

Saxon & Wall, for plaintiff and appellant.

McCloskey & Benedict, Saunders, Dufour & Dufour, for defendant and appellee.

ST. PAUL, J.—This is a petitory action. Defendant is in possession under a title derived from one whose possession is alleged to have begun more than thirty years before the bringing of this suit.

As plaintiff must recover primarily on the strength of his own title, it is incumbent upon him to examine and pronounce upon his alleged muniment of title before going into the question of the prescription which defendant sets up in the alternative.

That muniment of title is an alleged tax sale and a judgment confirming the same against the former owners of the property.

The tax sale relied upon is more than three years old, and no other serious attack is made or could be made upon it than that it does not describe the property sufficiently to identify it.

The judgment confirming the tax sale describes the property perfectly, and was rendered contradictorily with a curator ad hoc apointed to represent the former owners who were absent and unknown.

Under the terms of the Statute (Act No. 101 of 1898) these were the only necessary parties to the suit for confirmation, and they were properly represented by a curator ad hoc (**Clayton vs. Quaker Realty Co., 128 La., 103**). As the delays for appeal, whether by parties or by third persons, have now expired, that judgment is no longer subject to attack for any error therein.

En passant, it may be said that it is not at all manifest that there was error in the judgment of confirmation, since under the ruling in **Weber vs. Martinez, 123 La., 663**, the tax rolls may serve to amplify the description in the tax deed, and the property sold is sufficiently identified if it appear that the assessment and sale were intended to cover the only property belonging to the tax debtor within the limits fixed by the description given in the rolls. But be this as it may, the record in the confirmation suit shows that the objection now raised by this defendant was not only raised but urged repeatedly and strenuously by the curator ad hoc, and was repeatedly overruled. The error in the judgment, if any, could have been corrected only by timely appeal.

Hence as between plaintiff and the former owners of the property, that judgment is now conclusive regardless of any error therein, and in the absence of fraud it establishes, beyond the possibility of re-examination, first that **some property** belonging to these parties was validly sold for taxes, and secondly that the property so sold is **the same as that described in the judgment.** Those were the two issues presented and passed upon.

That such a judgment, the force of which was to decree plaintiff the owner of the property involved, has all the effect of a conveyance between the parties, is too clear to require more than the mere statement itself. The old English lawyers (or rather their civilian preceptors,

the clergy), saw this at once and took speedy advantage of it. By their fines and common recoveries they evaded the statute of Mortmain, and barred the entails, remainders and reversions which encumbered landed estates. Thus title "by matter of record," that is by **judgment of Court** became a common as well as the most effectual mode of conveyance known to the English law. **Blackstone Book 2, p. 357.**

This is cited not as a precedent, but simply as showing that the legal mind (whether under the domain of the civil or the common law) clearly apprehends that the effect of such a judgment is to pass the title to the property from one litigant to the other.

Hence the alleged outstanding titles which defendant relies upon as a shield herein, have either been wiped out or merged into that of plaintiff.

That such a judgment may be attacked by a party thereto on the ground of fraud or nullity may be conceded for the purposes of this case; but whether it be open to such attack by one who was not a party thereto, is a matter we do not find it necessary to pass upon.

For the defendant in this case complains indeed of the judgment of confirmation, as having been obtained by fraud; but the only ground set up is the alleged variance between the description as set forth in the pleadings and judgment, and that given in the tax deeds and assessment rolls.

This of itself does not show fraud, but merely error. For the rest, the record in the confirmation suit shows that it was plaintiff himself who introduced all the evidence and laid it before the Court; that the alleged discrepancies were pointed out, and the Court's attention drawn thereto. All that can be and is now said as to the proof not corresponding with the allegations and not

— 291 —

warranting the judgment, was said and insisted upon then. The Court may have erred, but if so, it was with eyes wide open and not because it was deceived or misled by plaintiff.

A judgment cannot be attacked for fraud where it is shown that the successful party produced his whole evidence and laid it before the Court, and the attention of the Judge was particularly directed to those very matters which are afterwards set up as constituting the fraud alleged to have been practiced upon the Court.

As to the prescription of thirty years relied upon by defendant we see no merit in it. One who claims property by prescription must show affirmatively and clearly the extent, nature and length of his possession. Defendant has failed to do so.

Its author was the New Orleans Spanish Fort and Lake R. R. Co., who acquired from Vincent Micas, on June 7th, 1879, certain property adjoining, but not including, that here in controversy.

How soon after that date it took possession of any land beyond the bounds of its purchase; the limits to which that posesssion extended, and the nature thereof; the intent which it had in going upon the land; these are all matters not shown with that certainty required of one who seeks to be declared the owner of property by usucaption.

That a great part of the land in controversy was under the waters of Lake Pontchartrain, and much of the rest a salt marsh until within the last few years seems certain. That some constructions were built on piles over the water, and others over public streets (or projected public streets) also appears; and there was a break-water intended only to secure the shore line against erosion by the waters of the lake.

There was also a fence, but its exact, or even approximate, location is not shown with any thing like certainty; nor is it shown what land it was intended to enclose or did enclose.

A former president of the railroad company testified that the company never pretended to claim ownership of any land beyond the limits of its purchase. Another official testified that the highland extended only a little distance from the railroad track; that a fence was put up to prevent persons from going on the track where they might be injured; that the railroad was in possession of its right of way as licensee of the city not as owner; that it expropriated no property and paid taxes only on trackage.

Only one witness attempts to fix some definite time as a starting point for prescription. He testified to a fence that stood on the land and seemed to mark the boundary thereof in the spring of 1880 (more than thirty years before this suit was filed), the remains of which were still standing in 1907, when it was torn down and a new fence put up to replace it.

But that fence is not shown on the survey made about that time, and is not remembered by others who were in a position to observe it so that it had either disappeared in time or was not in the position in which the witness first mentioned seems to think it was. But at any rate there is no such certainty about it as to serve as a basis for prescription, since one who relies on prescription holds title only "by inches."

Moreover, this fence, wherever it was, was not removed and replaced by the Spanish Fort R. R. Co, but by another company, between whom and said Spanish Fort Company, no privity of title or possession is shown. Inasmuch as the only possession of the land in controversy which

the Spanish Fort Company had at that time, was a civil one which continued only by virtue of the remains of its ancient constructions, the destruction of these and the replacing thereof by a new construction erected by a stranger to it, constituted a new possession and operated as a complete interruption to any prescription that might have been running in its behalf.

Defendant has not made out a title by prescription and plaintiff must therefore recover the land.

It is therefore ordered that the judgment appealed from be reversed and it is now ordered that plaintiff, Willis J. Roussel, do have and recover of defendant, the Railways Realty Company, the property in controversy herein, and more particularly described in the petition on file and in the judgment of confirmation rendered in the matter of **Willis J. Roussel vs. John Nixon, et al, No. 86,930** of the docket of the Civil District Court for the Parish of Orleans. The defendant and appellee to pay the costs of both Courts.

Dufour, J., takes no part.

April 1st, 1912.

## ON REHEARING.

1. A judgment confirming a tax title, rendered contradictorily with the former owners of the property, is binding on all the world.
2. A mere possessor, with prescription running in his favor, but not completed, has no vested rights in the property, but only an inchoate, contingent, or expectant right to complete a title by prescription if not disturbed (12 Rob., 266-272).

ST. PAUL, J.—In their brief for rehearing counsel say: "One fact found by the Court, is not in our opinion borne out by the record. * * * There was no

interruption in whatever possession it (The Spanish Fort Company) acquired in 1878 up to the time of defendants acquisition (1909). It is true that its charter expired in 1903, and Mr. R. B. Fowler became its receiver, and it was in his capacity as receiver, that he placed the watchman on the property, and upon discontinuing the watchman, as testified to by Mr. Farrar, erected the fence upon the old line.''

As we read the record the last officers of the Spanish Fort Company (nominally still in office as late as 1908) were a president, who had left the State, and a Secretary, who was no longer active. In the receivership proceedings he is termed ''late Secretary.''

No receiver was appointed to that company until June 1908. And when the watchman was displaced and the fence erected in 1907, it was done, not by a receiver or officer of the Spanish Fort Company, but by the General Manager of the New Orleans Terminal Company, and the only connection between that company and the Spanish Fort Company, was that the former owned all the stock and all the bonds of the latter.

But this did not make the two companies one, or give the general manager of one company any authority to act for the other. In the case of **Ferdinand Illg vs. Stephen Brulard, Executor**, decided by this Court February 20th, 1912, (No. 5498 of our docket) we said:

"The fact that one person owns all the stock in a corporation does not destroy the corporation or make him and the corporation one and the same person, but the latter continues to exist as a separate entity, and the former continues to occupy the statutes of a stockholder.''

As to the right of defendant to set up the alleged nullity of the judgment of confirmation (on the ground of

fraud) that was in effect conceded for the purposes of this case, by the very fact that the Court proceeded to examine and pass upon the alleged grounds of nullity. We merely refrained from declaring any general doctrine on a point which appeared to us as not being free from doubt.

But we held, and we still hold, that the **correctness,** as distinguished from the **validity,** of a judgment of confirmation, obtained contradictorily with the true owner of the property is not open to investigation by any third person whomsoever. And the authorities cited by defendant hold nothing to the contrary.

In all these cases the right of third persons to challenge collaterally the **validity** of a judgment, not the correctness thereof was upheld. And the distinction is obvious; if the judgment be **null,** there is then no judgment at all. On the other hand if the judgment be **valid** third persons have no interest whatsoever in the correctness thereof.

In the case at bar, if the judgment of confirmation be binding on the former owners of the property, the defendant in this case has no more concern in the grounds upon which that judgment was based, or interest in the subject matter thereof, than if the former owners had themselves conveyed the property to plaintiff **by deed.**

For **that judgment itself,** regardless of what foundation or lack of foundation it may have to rest upon, is a title translative of the property, having therefore all the force and effect of a conveyance between the parties thereto.

Such is the doctrine of the French Court of Cessation as announced in two decisions of that eminent tribunal (See **Veuve Mailly vs. Commune d'Auneuil** February 21, 1827, reported in Dalloz, Jurisprudence du Royaume, Vol. 1833, part 1, page 301; and **Commune d'Arbigny, vs.**

d'Arbigny, July 14, 1835, reported in Dalloz, Jurisprudence, etc., Vol. 1835, part 1, pages 326, 327.)

In those two cases that high Court distinctly held that a judgment awarding property to a plaintiff in an action had contradictorily with an apparent owner is a "just title," i. e., a title translative of the property.

Our own Supreme Court has gone even further, citing twice with approval the doctrine of Toullier, that a judgment for the thing, obtained contradictorily with the **apparent owner is res judicata against the true owner.** (See **Roach vs. Craig, 124 La., 688;** and **Johnson vs. Wild, 8 La. An., 126.**)

From all of which it follows as a matter of course and **a fortiori,** that a valid judgment against the **true** owner passes the title absolutely to the successful litigant, and is **res judicata** against all the world, regardless of the grounds or lack of grounds on which it is based.

And this is particularly true of a judgment confirming a tax title. It is historically well known and abundantly appears in our jurisprudence that before the constitution of 1898, the status of tax titles in this State was such as can only be described as chaotic.

As a consequence of such conditions, tax sales were shunned and property held by tax deed was a drug upon the market. For want of bidders at the tax offerings, an immense amount of valuable property had to be taken over for taxes by the State; which had no use for it, could not administer it, and could not get rid of it or restore it to the tax rolls except by giving it away, as it were; the almost uniform price for property sold even under Act 82 of 1884, the so called Iron Clad Law, was "one dollar," a price which, under the Code, means a gift. (C. C. 2464.)

With full knowledge of these conditions, and endeavor-

ing to correct them, the Convention of 1898 directed the Legislature to provide "a form of proceeding to quiet tax titles." **Const. Art. 233.**

Pursuant to that constitutional mandate the Legislature, at its first session thereafter, passed Act No. 101 of 1898, providing for the proceeding known as the action to confirm a tax title; which action was to be brought against "the former proprietor of the property," and was to result in a judgment of the Court "quieting and confirming the title."

If the result of this constitutional mandate, and the legislation intended to carry it into effect, be no more than to quiet and confirm tax titles as to the former owners only, divesting these of their property indeed but leaving the title still open to attack by all others, then vain indeed was the work of Convention and Legislature, and futile their efforts, which have resulted only in ousting one title, without "quieting or confirming" in any sense another; thus making confusion all the more confounded.

**Interest rei publicae ut sit finis litium** is the maxim and policy of the law. And both Convention and Legislature intended that procedings to "quiet and confirm tax titles" should be such **in fact** as well as in name.

That legislative purpose, which to us seems clear, is the guide by which we must go; and we have no hesitation whatever in holding that a judgment confirming a tax title, rendered contradictorily with the former owners of the property is binding on all the world.

The statute violates no constitutional provision. Under it no man can be deprived of **his** property without due process of law, for the owner must be cited; but those who are mere possessors, with prescription running in their favor but not completed, **have no vested rights**

in the property **(Calvit vs. Mulhollan, 12 Rob., 266-272)** and are not necessary parties to the action for confirmation of title. The **subsequent** sale of the property to defendant affected in no manner the status of the confirmation proceeding, then already perfected, and gave to defendant only what its authors themselves then had, to-wit, only an inchoate, contingent, or expectant right to complete a title by prescription if not disturbed.

The authorities cited, as to a defendant in possession under title, are not applicable.

We stated at the outset of our opinion that plaintiff must recover on the strength of his own title, and it is our conclusion that from the time of the confirmation his title was and is good against the world.

As to the claim that Lot No. 1 of Square 1805 is included in the deed from Micas to the Spanish Fort Company, passed before John Bendernagle, notary, on June 7th, 1879, defendant is in error. According to the plan of Edgar Pilie, surveyor, dated January 11th, 1909, that lot is situated at a distance of 426 feet from the Bayou St. John, measured along the prolongation of First Street (380 x 110 - 490 - 64 - 426) and about the same distance along the line of the old bulkhead. But the deed aforesaid conveys no land distant more than 419 feet from the bayou at any point, and hence does not include the aforesaid Lot No. I, nor any part thereof.

As to defendant's call in warranty we have not noticed it because this Court is powerless to deal with it in this appeal. Under the jurisprudence a judgment cannot be amended between co-appellees.

We venture the suggestion however that defendant is not without a remedy if pursued in time.

Rehearing refused.

Dufour, J., takes no part.

May 13th, 1912.

June 20th, 1912, Decree Supreme Court, writ granted.